JENKINS, J.,
dissents and assigns reasons.
1,1 respectfully dissent from the majority’s holding in the instant case. I further disagree with this Court’s recent decision in Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 13-1651 (La.App. 4 Cir. *973 5/21/14), 141 So.3d 891, writ denied, 14-1285 (La.9/26/14), 149 So.3d 266, and 14-1351 (La.9/26/14), 149 So.3d 269.[1] Upon de novo review of the facts of this case and the questions of law presented, which are substantially the same in Borgnemouth, I find the trial court erred as a matter of law in finding the Parish of St. Bernard (“the Parish”) and the Lake Borgne Basin Levee District (“Levee District”) liable for the taking of plaintiffs’ property under Louisiana law.
Both cases present the legal question of whether a taking of private property has occurred under Louisiana law. Louisiana Constitution Article I § 4 provides, in pertinent part, “[p]roperty shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid |2to the owner or into court for his benefit.” However, where the state or its political subdivisions have no control or direction over the actual taking or damaging of the private property, our Louisiana jurisprudence does not support a claim for compensation from the state and its political subdivisions. See Cooper v. City of Bogalusa, 195 La. 1097, 198 So. 510 (1940); Vuljan v. Bd. of Com’rs of Port of New Orleans, 170 So.2d 910, 912 (La.App. 4th Cir.1965); Petrovich v. State of Louisiana, 181 So.2d 811 (La.App. 4th Cir.1966); Holzenthal v. Sewerage & Water Bd. of New Orleans, 06-0796 (La.App. 4 Cir. 1/10/07), 950 So.2d 55. As a matter of law, the state and its political subdivisions cannot be held liable for the taking and damaging of private property under circumstances in which the federal government carries out the taking and damaging of the private property as part of a federal project.
[T]he issue of whether a particular entity has taken property within the meaning of the Constitution is to be decided on the facts of the individual case. There simply is no bright line by which it can be determined that an entity did or did not cause an inverse condemnation of property.... whether an action will lie under the Louisiana eminent domain provision or the Fifth Amendment to the United States Constitution depends entirely upon whether the public project is state or federal, and which government was acting under its power of eminent domain in carrying out the public project.
Holzenthal, 06-0796, p. 15, 950 So.2d at 66.
The facts and evidence in this case reveal that the Emergency Repair and Rehabilitation project of the Lake Pontehar-train Louisiana and Vicinity Hurricane Protection Levee (“LPLV levee”) was planned, executed, and completed under the power and authority of the federal government through the United States Army Corps of Engineers (“USACE”). Furthermore, an historical review of the laws providing for the creation, maintenance, and repair of this levee under the *974 federal Flood Control Act reveals that the LPLV levee is designated as a federally ^constructed Hurricane/Shore Protection Project subject to emergency repair by the federal government. See Flood Control Act of 1965, Public Law 89-298; 33 U.S.C. § 701(n). Based on my review of the law, facts, and evidence in this case, I find the taking of the plaintiffs’ property was the result of an exclusively federal project for which the Parish and the Levee District cannot be held liable under a state constitutional takings claim.
FACTUAL BACKGROUND
The- location of plaintiffs’ property is a highly relevant fact in this case. Plaintiffs own private immovable property in St. Bernard Parish located along the west side of the Mississippi River-Gulf Outlet (“MR-GO”) and immediately adjacent to, and on the protected landside of, the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Levee (“LPLV levee”).
The MR-GO was constructed by the USACE pursuant to Congressional authority, Public Law 84-455, to operate as a navigation channel between the Port of New Orleans and the Gulf of Mexico. In Vuljan v. Bd. of Com’rs of Port of New Orleans, 170 So.2d 910, 912 (La.App. 4th Cir.1965), this Court found the MR-GO to be an exclusively federal project,' over which the federal government through the USACE had exclusive jurisdiction and control.
The LPLV levee was also authorized by Congress, under the Flood Control Act of 1965, and constructed by the USACE, to provide hurricane protection to areas around Lake Pontchartrain and along the MR-GO. Pub.L. No. 89-298, § 204, 79 Stat. 1073, 1077 (1965). The LPLV levee is designated as a federally authorized flood control project, formally known as a Hurricane/Shore Protection Project (“HSPP”) and it is subject to the federal statutory scheme under which it was created. See 33 U.S.C. § 701 et. seq; 33 U.S.C. § 2213(j). Under this federal |4scheme, the states and their levee districts agree to assume responsibility for operation and maintenance upon the completion of the project, but the federal government maintains authority and responsibility to conduct emergency operations and rehabilitation activities. See 33 C.F.R. § 203.82. In the' event that a federally authorized HSPP has been “damaged or destroyed by wind, wave, or water action of other than an ordinary nature,” the USACE is authorized and funded to repair and rehabilitate that federally authorized HSPP and may assume 100 percent of the costs for rehabilitation.[2] 33 U.S.C. § 701n; See *975 also 33 C.F.R. § 203.82(f). As set forth in detail in the Cooperation Agreement between the USACE and the Parish and the Levee District, the USACE invoked its authority to complete the emergency repairs and rehabilitation of the LPLV levee due to the unforeseen, substantial damage from Hurricane Katrina.
In Borgnemouth, the Court stated “[Responsibility for the ongoing maintenance and repair of the MR-GO levees remained with the Levee District.” This statement oversimplifies the statutory framework, regulations, and [ Sfederal/state cooperation agreements under which this levee was created and continues to be governed. See 33 U.S.C. § 701 et seq. As I have discussed above and will outline below, the USACE had the authority to conduct this emergency repair and rehabilitation project and, under that authority, the USACE directed, planned, controlled, and executed every aspect of this project.
This Court acknowledges in Borgnemouth that if the levee repairs are a federal project, then, as a matter of law, the Parish and Levee District would be relieved from providing just compensation to plaintiffs. 13-1651, p. 20, 141 So.3d at 904. In this case, the majority did not review and consider all of the pertinent facts and evidence in this case because it held the reasoning within Borgnemouth dispositive on all issues. The Court’s reasoning in Borgnemouth on this issue of the taking relies solely on the fact that the Commandeering Order and the Authorization for Entry invoked state law to quickly expropriate the land and authorize the project to be performed by the USACE. Again, I find this to be an oversimplification of the facts and evidence necessary to make the determination of whether this project was state or federal in nature. Thus, I now review the facts of this case which lead me to the conclusion that the LPLV levee repair and rehabilitation following Hurricane Katrina was a federal project and, consequently, the Parish and Levee District are not liable to compensate the plaintiffs.
The Commandeering Order & the Cooperation Agreement
When Hurricane Katrina made landfall on August 29, 2005, portions of the LPLV levee adjacent to plaintiffs’ property sustained significant damage. From that moment, the USACE began organizing, planning, and overseeing the repair and rehabilitation project for the LPLV levee. Prior to the issuance of the Commandeering Order and Authorization to Entry, on September 19, 2005, the Chief of the Real Estate Division of the USACE sent a letter to the Levee District stating that the USACE proposes to perform repairs to the LPLV in St. Bernard ^Parish, pursuant to the provisions of P.L. 84-99 (the Flood Control Act of 1965). The letter particularly describes the location of lands, including “borrow areas,” required for the USACE to perform the necessary repairs and states that the rights of entry are required as soon as possible in order to begin the work.
On September 29, 2005, the Parish President signed the Commandeering Order for the use of certain private immovable property to be used “to obtain borrow materials, gain access, and construct (repair and rehabilitate)” the LPLV levee. *976 The Order also granted an irrevocable right of entry to the property to the Levee District with the stated understanding that “the Levee District will tender an Authorization for Entry for Borrow, Access and Construction (repair and rehabilitation) to the United States Army Corps of Engineers ... to enter upon these lands to repair and rehabilitate said levee as set forth in the plans and specifications held in the U.S. Army Corps of Engineers’ District Office, New Orleans, Louisiana.” On September 30, 2005, the day after the Parish President signed the Commandeering Order, the Levee District signed the Authorization for Entry to allow the USACE to complete the necessary repairs and rehabilitation of the levee.
On October 2, 2005, before the USACE began the repair and rehabilitation project on plaintiffs’ property, the USACE, the Levee District, and the Parish entered into and signed a Cooperation Agreement for “Rehabilitation of a Federal Hurricane/Shore Protection Project.” The Cooperation Agreement, formally amended on October 17, 2005, declares the federal authority under the Flood Control Act of 1965, generally, and 33 U.S.C. 701n, specifically for the construction, repair, and rehabilitation the LPLV levee — a federally authorized Hurricane/Shore Protection Project (HSPP).
The following provisions of the Cooperation Agreement outline the terms, conditions, and obligations of each party to the agreement and make clear that the [ 7repair and rehabilitation of the LPLV levee in St. Bernard Parish is a federal project.
1.Article I.A defines the “Rehabilitation Effort” as all repairs, rehabilitation, and replacement of portions of the LPLV levee as described in the Project Report prepared and approved by the USACE District Engineer.
2. Article I.B specifies that the “Rehabilitation Effort costs” incurred by the federal government “shall include, but is not necessarily limited to: actual construction costs, including supervision and inspection costs; costs of contract dispute settlements or awards; the costs of lands, easements, rights of way, borrow, and relocations that are not owned, claimed, or controlled by the Public Sponsors;.... ”
3. Article II outlines the obligations of the federal government and the Public Sponsors. “The [USACE] ... shall expeditiously construct the Rehabilitation Effort, applying those procedures usually followed or applied in Federal projects, pursuant to Federal laws, regulations, and policies.” While allowing the Public Sponsors to review and comment on the issuance of contract bids, the USACE retains all control, stating, “[t]he District Engineer will, in good faith, consider the comments of the Public Sponsors, but award of contracts, modifications or change orders, and performance of all work on the Rehabilitation Effort shall be exclusively within the control of the District Engineer.”
4. Article III.A.3, specifically provides the manner in which the Public Sponsors acquire and provide rights of entry to the privately owned lands, easements, and rights of way (referred to as Private LERD) necessary for the rehabilitation effort. The provision states that the Public Sponsor “shall secure” a commandeering order from the Parish | president “which said order or orders shall commandeer Private LERD, ... as determined by the [USACE] to be necessary for the *977 construction, operation, and maintenance of the Rehabilitation Effort.” After which, the “Public Sponsors shall tender a right of entry to the [USACE] for the Private LERD.”
5. The USACE further obligates itself, in Article II.B.l and restated in Article III.B, to “identify and pay just compensation to the owners of a compensable interest in the [Private] LERD described in Article III.A.3.”
6. Article IV.A sets forth the payment requirements under the agreement, revealing that the full cost of the Rehabilitation effort is assumed by the federal government. “Rehabilitation Effort costs are currently estimated to be $57, 780,000. In order to meet the Public Sponsors’ cash payment requirements, the Public Sponsors must provide a cash contribution estimated to be $0.0.”
The Cooperation Agreement invokes the power and authority of the federal government to plan and execute the rehabilitation project with very limited involvement of the Public Sponsors — the Parish and the Levee District — by furnishing the Private LERD for which the USACE agreed to compensate the private property owners.
Letters and Offer of Compensation from USACE to Plaintiffs
The USACE further acknowledged their responsibility for this project in -written correspondence with the plaintiffs. The USACE identified plaintiffs as the property owners of the land affected and used in the course of the project and began sending written correspondence to plaintiffs in January, 2006.
In January, 2006, the USACE sent a letter to plaintiffs stating that they had been' identified as the owners of private property affected by federally authorized repairs to the hurricane protection levee. The letter states that, due to the June 1, 192006 deadline for performing the necessary repairs to the levee, the USACE took “extraordinary measures” by asking the Parish President to exercise his authority under the Louisiana Homeland Security and Emergency Assistance and Disaster Act to commandeer certain private property needed for the repair work. The letter also informs plaintiffs that the USACE agreed to provide just compensation to property owners. Finally, the plaintiffs were directed to contact the USACE with any questions regarding this matter.
In a letter dated October 24, 2006, addressed to plaintiffs’ attorney, the USACE informed the plaintiffs of the efforts to appraise the land affected by the repair work and ensured the plaintiffs that “it has always been our intention to compensate the landowner(s) for property commandeered for emergency repair and rehabilitation of the Lake Pontchartrain and Vicinity, Chalmette Loop, Hurricane Protection Levee post Katrina.” In August, 2007, the USACE sent letters to plaintiffs informing them that property appraisals had been completed for the tracts of plaintiffs’ property affected by the repair work and the USACE was prepared to make its offer of just compensation, in accordance with federal law.[3]
*978 In the deposition testimony of plaintiffs’ representative, Lewis Frank, I find further support that the plaintiffs knew that the levee repairs were under the direction and control of the USACE rather than the Parish or the Levee District. |inMr. Frank stated that, before receiving any written communication, he was contacted by Janet Cruppi, with the USACE’s Task Force Guardian, who stated to him, “we have commandeered your property.” Mr. Frank stated that the discussion did not “get into particulars” but Ms. Cruppi did reference compensation for the taking of plaintiffs’ property. Mr. Frank stated that he, on behalf of the plaintiffs, discussed and attempted to negotiate with the USACE, but never the Parish or the Levee District, regarding compensation for the value of the plaintiffs’ property used and removed. Furthermore, when asked if he knew who did the work to rebuild the levee, he stated it was Granite Construction on a contract through the USACE.
Louisiana Jurisprudence
The facts and evidence reveal that the USACE acted under federal law to effect the taking of plaintiffs’ property for a federal project. “[I]f the public improvement is a federal project, the State cannot be sued directly merely because the State contributed to the cost of the project. The test, therefore, is whether or not the project is State or Federal.” Vuljan v. Bd. of Com’rs of Port of New Orleans, 170 So.2d 910, 912.
In Vuljan, this Court considered whether a cause of action properly lied against the State for the taking or damaging of oyster leases caused by the construction of the MR-GO channel. There, as in this case, the State was required by the federal government to furnish all lands, servi-tudes, and rights-of-way necessary for the construction, maintenance and operation of the project. Thereafter, the USACE executed the plans it had designed to construct the channel. “The federal government alone constructed it after deciding where the project would be built, what spoil disposal areas it would need, their direction and width, and what land, navigation servitudes or easements were required. The State took nothing.” Vuljan, 170 So.2d at 912. The Court found that the damage to the oyster | nbeds, and thus the leaseholders’ interests, did not result from the taking by the State but were brought about by the activities of the USACE in furtherance of the federal project.[4] This . Court held that the plaintiffs *979 did not have a cause of action for inverse condemnation against the State because the construction of the MR-GO channel was a completely federal project under the exclusive jurisdiction and control of the United States through the USACE.
In Holzenthal v. Sewerage & Water Bd. of New Orleans, this Court again addressed this issue of federal or state liability for inverse condemnation of private property. 06-0796 (La.App. 4 Cir. 1/10/07), 950 So.2d 55. “[T]he issue of whether a particular entity has taken property within the meaning of the Constitution is to be decided on the facts of the individual case. There simply is no bright line by which it can be determined that an entity did or did not cause an inverse condemnation of property.” Id., 06-0796, p. 15, 950 So.2d at 66. This Court reviewed the facts in Vuljan, finding in that case the State’s participation in the project was limited to its agreement to furnish the necessary lands, servitudes and rights-of-way, and to use its inherent power of eminent domain to save the United States harmless against claims arising out of the Outlet’s construction, maintenance, and operation. Id. 06-0796, p. 16, 950 So.2d at 67. “There is no indication that the State of Louisiana had any participation in project design, | ^monitoring, financing or otherwise.” Id. By contrast, the facts in Hol-zenthal established that the Cooperation Agreement between the federal government and the Sewerage & Water Board (“SWB”) specified continuing input, consultation, and shared responsibilities for the project. The SWB co-chaired a coordination team that oversaw issues related to design, planning, scheduling, contract awards, costs, inspections, and more. Finally, the SWB was responsible to contribute a minimum of 25 percent but not more than 50 percent of the costs of the total project. The Court found these facts distinguishable from Vuljan, and from Petro-vich v. State of Louisiana,[5] in that the exclusivity of jurisdiction and control was not present in Holzenthal. Id., 06-0796, pp. 18-19, 950 So.2d at 68.
Trial Court Reasons for Judgment
In the instant case, before the trial court, the Parish and the Levee District relied on the reasoning in both Vuljan and Holzenthal in arguing that this levee repair and rehabilitation project was federal in nature. In addressing this issue, the trial court acknowledged that only the USACE planned, developed, and executed all the necessary steps of the levee project, “save and except the signatures of the local officials.” The trial court stated, “[i]t is abundantly clear the plan was ‘hatched’ by the Corps of Engineers” and “the Corps was clearly ‘driving the bus’.” The trial court, however, still held the Parish and Levee District liable for the taking, *980 stating that they “actively participated in concert” with the USACE.
The trial court also reasoned that the issue of federal versus state liability had already been considered and decided within a related federal case, stating “the federal district court determined this very levee project was a [sic] not a federal 11sproject.”[6] The trial court referenced, as does the majority in this case, the Order and Reasons of the United States District Court for the Eastern District of Louisiana in Olivier Plantation, L.L.C. et al. v. St. Bernard, Parish et al., 744 F.Supp.2d 575 (E.D.La.2010), relating to the removal of the instant case to federal court. In order to understand the Order and Reasons of the U.S. District Court remanding this case to state court, it is important to consider the original petition and procedure of this case.
The plaintiffs in this case originally filed suit only against the Parish and the Levee District in state court, the 34th Judicial District Court in St. Bernard Parish, on May 18, 2007. That petition alleges that the Parish and the Levee District acted in concert with each other to effect the taking of plaintiffs’ property under state law. The petition does not include any allegations referring to the Cooperation Agreement between the Parish, the Levee District, and the USACE. Plaintiffs’ petition makes one reference to the actions of the USACE stating, “[p]ursuant to the Authorization, the Department of the Army, its agents, employees, and contractors entered upon the Properties and removed large quantities of borrow material and caused damages through their access and construction activities.” Plaintiffs claim, however, that the actions of the Parish and the Levee District caused the damages from the access and construction activities on plaintiffs’ property and, therefore, owe compensation for the taking of borrow material pursuant to Louisiana Constitution Article I, § 4. Plaintiffs’ petition does not state a cause of action under any theory of liability, under state or federal law, against the USACE.
114Order and Reasons for Remand from Federal District Court
Before the action proceeded to trial, the Parish filed an amended answer and a third party demand against the USACE. The Parish alleged that the damages to plaintiffs’ property were caused by the actions of the USACE and the USACE owed contribution for all damages that may be awarded plaintiffs based on the terms of the Cooperation Agreement.
Once named as a third party defendant in the suit, the USACE filed a Notice of Removal to the U.S. District Court for the Eastern District of Louisiana. In the federal court action, plaintiffs filed a motion to sever, motion to dismiss, and motion to remand.[7]
*981 The U.S. District Court ruled to sever and dismiss the third party demand and to remand plaintiffs’ Louisiana state law claims to state court. See Olivier Plantation, L.L.C. et al. v. St. Bernard Parish et al., 744 F.Supp.2d 575 (E.D.La.2010) (hereinafter Olivier II). In its order and reasons, the District Court reviewed the bases upon which the action was removed to federal court and examined whether the court held subject matter jurisdiction over any of the claims within plaintiffs’ petition. In a thorough discussion of subject matter jurisdiction under the Federal Tort Claims Act,[8] the Tucker Act, and the federal officer removal 11fistatute,[9] the District Court determined that it lacked subject matter jurisdiction over the claims alleged within the plaintiffs’ petition and over the third party demand. Olivier II, 744 F.Supp.2d at 583-589.
The District Court also determined that the Court of Federal Claims had no jurisdiction over the principal action based on the claims alleged within plaintiffs’ petition.[10] Id. at 588. The District Court found that the petition contained no allegations of a Fifth Amendment Takings claim against a federal agency, that the exceptions to the well-pleaded complaint rule do not apply in this case, and a state law takings claim is not completely preempted by federal law. Furthermore, even though the Parish and Levee District raise defenses invoking federal law and a Fifth Amendment taking by the USAGE, “determination of jurisdiction starts with the complaint” and “federal defenses to a claim ... are not sufficient to confer subject matter jurisdiction.” Olivier II, 744 F.Supp.2d at 584. Finally, the District Court found that a transfer of the Parish’s third party demand against the USACE would be premature because it is entirely dependent upon the resolution of the plaintiffs’ claims under Louisiana state law. Id. at 589.
Ultimately the District Court found the matter could not be transferred to the Court of Federal Claims, and neither could the District Court address any of the issues within the petition; consequently, the District Court held that it did not have any subject matter jurisdiction. Contrary to the trial court’s statement that the federal district court made a finding that this very levee project was not a federal project, the U.S. District Court made no findings re *982 garding the factual or |1fisubstantive legal issues in this case. Rather, the District Court’s order and reasons thoroughly discusses and explains the inability of the court to review any issues in the case due to the lack of subject matter jurisdiction. The District Court reviewed the allegations within plaintiffs’ - petition and the third party demand and determined it could not exercise any federal jurisdiction in the case. “Under the well-pleaded complaint rule, the plaintiff is the master of the claim and may avoid federal jurisdiction by exclusively relying on state law, even where a federal claim is also available.” Olivier II, 744 F.Supp.2d at 584 citing Hoskins v. Bekins Van Lines, 343 F.3d 769, 772-72 (5th Cir.2003)(“A plaintiff with a choice between federal — and state-law claims may elect to proceed in state court on the exclusive basis of state law, thus defeating the defendant’s opportunity to remove, but taking the risk that his federal claims will one day be precluded.”). Federal jurisdiction is not determined on the substantive merits of a claim. See Fragumar Corp., N.V. v. Dunlap, 685 F.2d 127, 129 (5th Cir.1982). Thus, I find the trial court erroneously stated that the federal district court found that the levee repair and rehabilitation project was not a federal project, because the District Court did not make any factual findings.
The plaintiffs in this case strategically plead allegations against state entities under state law and avoided any federal jurisdiction. Plaintiffs’ procedural maneuvering does not, however, offer any support for the proposition that a federal Fifth Amendment takings claim asserted by these plaintiffs against the USACE would have failed and found no liability of the USACE. Rather, the United States Court of Federal Claims has held the USACE exclusively liable for the taking of private property in Plaquemines Parish in a factually similar, “closely related” case. National Food & Beverage Co., Inc. v. U.S, 10-152L, 96 Fed.Cl. 258 (2010) (“National Food I”) (denying motion to dismiss); National Food II, 10-152L, 103 Fed.Cl. 63 (2012) (granting partial summary judgment on issue of liability); National Food III, 10-152L, 105 Fed.Cl. 679 (2012) (awarding just compensation and damages for the USACE’s taking of plaintiffs property).
The underlying facts in National Food are substantially similar to the instant case and Borgnemouth. The case arose out of the same events following Hurricane Katrina. Plaquemines Parish issued a Commandeering Order for the plaintiffs property and an Authorization for Entry to allow the USACE to repair and rehabilitate the levee adjacent to plaintiffs property. National Food I, 96 Fed.Cl. at 261. Plaquemines Parish also entered into a Cooperation Agreement with the USACE by which the United States government agreed to identify and pay just compensation to the owners of the commandeered private property. Id. The USACE then entered upon plaintiffs property and proceeded to remove substantial amounts of clay in the process of its repair and rehabilitation project.
Distinguishing it from the instant case and Borgnemouth, the plaintiff in National Food filed a complaint in the Court of Federal Claims in May, 2010, raising a Fifth Amendment takings claim against the USACE. The USACE filed a motion to dismiss arguing that any liability for the taking lies with Plaquemines Parish because it was the state entity that issued the Commandeering Order under Louisiana state law. The court, however, found,
[t]he commandeering order effected a right of entry to the property. However, that order was not issued for a non-federal purpose. Rather, it was issued *983 by Plaquemines Parish to support the Federal Hurricane Protection Project, as the Amended Cooperation Agreement provides.... the commandeering order itself can be attributed to the federal government.
National Food I, 96 Fed.Cl. at 264. In denying the motion to dismiss the claims against the USACE, the Court of Federal Claims also noted,
The Parish only issued the order because the Corps had in the Cooperation Agreement asked the Parish to take that step. Most importantly, the Parish had no part in physically removing the clay from National Food’s land. That effort was entirely undertaken by the Corps, pursuant to its own plan and for its own purpose.
National Food I, 96 Fed.Cl. at 266.
In a separate ruling on the plaintiffs motion for partial summary judgment on the issue of liability, the Court of Federal Claims found the federal government/USACE “liable under the Fifth Amendment for the temporary occupation of plaintiffs land and the permanent appropriation of plaintiffs clay.” National Food II, 103 Fed.Cl. at 70.
I find the analysis and reasoning of the Court of Federal Claims on the issue of liability for the taking of private property is the same as applied by this Court in Cooper, Vuljan, Petrovich, and Holzenthal. However, I find this analysis missing from this Court’s decision in Borgnemowth and the majority opinion in the instant case.
Based on an analysis as formerly applied by this Court, I have reviewed the record de novo and found that the facts and evidence in this case clearly establish that the federal government through the actions of the USACE effected the taking of plaintiffs’ property as part of an exclusively federal project under federal law. Although the use of the Commandeering Order invoked the power and authority of the Parish President under the Louisiana Homeland Security and Emergency Assistance and Disaster Act and uniquely distinguishes this case from Cooper, Vuljan, Petrovich, or Holzenthal, the analysis remains the same.[11] The act of signing these agreements is not the one determinative fact upon which the Court makes its finding of state or federal liability for the taking. “[Wjhether a particular entity has taken property within the meaning of the Constitution is to be decided on the facts of the individual case.” Holzenthal, 06-0796, p. 15, 950 So.2d at 66.
|19The totality of the facts and circumstances must be examined to determine which government actually effected the taking and damaging of private property. Under the facts and circumstances of the instant case, as well as in Borgnemouth, I find the taking and damaging of plaintiffs’ property was for a federal purpose and conducted as a federal project. Consequently, the Parish and the Levee District cannot be liable for an exclusively federal project.

. The instant appeal and the appeal in Borgnemouth were pending before separate panels of this Court at the same time. Despite the fact that Borgnemouth involves nearly identical issues raised by the same defendants, I do not believe the majority should merely adopt the reasoning and holding from the Borgnemouth decision on those issues. Each case involves a separate constitutional takings claim that must be reviewed de novo. Louisiana courts do not recognize the doctrine of stare decisis; J. dissents in part the holdings by this Court áre persuasive but not authoritative, and we are not bound even by a recent decision within our own Court. See Doerr v. Mobil Oil Corp., 00-947, pp. 13-15 (La. 12/19/00), 774 So.2d 119, 128-29. Furthermore, the denial of writs in Borgnemouth by the Louisiana Supreme Court has no prec-edential value. St. Tammany Manor, Inc. v. Spartan Bldg. Corp., 509 So.2d 424 (La.1987); State v. Williams, 13-2732, p. 4 (La.1/17/14), 132 So.3d 381, 383.

. The Senate Committee on Homeland Security and Governmental Affairs held a hearing on December 15, 2005, to discuss “Who’s in charge of the New Orleans Levees?" The Committee requested a study and statement from the U.S. Government Accountability Office for the hearing. The GAO provided information on the history, background and Congressional authorization for the Lake Pontchartrain project; the authorities, roles and responsibilities of the USACE and the local sponsors with respect to construction, operation, maintenance of the levees; authorities, roles and responsibilities of each party when levees fail or are damaged, and the USACE response after Hurricane Katrina. The GAO made the following finding and statement as to the repair and rehabilitation of the LPLV levee:
Rehabilitation activities include the repair and restoration of eligible flood control projects and federally constructed hurricane or shore protection projects.... Any damage to federally constructed levees are repaired with 100 percent of the cost borne by the federal government; ... in the aftermath of Hurricane Katrina, the Assistant Secretary of the Army for Civil Works agreed to rehabilitate all of the damaged Lake Pontchartrain and other hurricane and flood control structures in the New Orleans area without any local cost share, under emergency authority provided in statute. Further, the *975 federal government will fund the acquisition of lands, easements, rights-of-way, and disposal or borrow areas not owned or under control of the nonfederal sponsor,....
Statutory and Regulatory Framework for Levee Maintenance and Emergency Response for thé Lake Pontchartrain Project: Hearing Before the S. Comm, on Homeland Security and Governmental Affairs, 109th Cong. 616 (2005) (statement of Anu K. Mittal, Director Natural Resources and Environment); U.S. Gov't Accountability Office, GAO-06-322T (2005).

. The letters stated, in pertinent part,
By provisions of the Fifth Amendment to the U.S. Constitution which recognizes the rights of both Government and private citizens, no person shall be deprived of life, liberty, or property without due process of law', and the eminent domain clause provides nor shall private property be taken for public use, without just compensation.’ To ensure that these rights are protected, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91-646, as amended, was enacted. Therefore, all owners of property utilized for repair and rehabilitation work will be provided with an offer of just compensa *978 tion for any temporary and/or permanent rights required for the construction, maintenance, and operation of a project.
Each letter then particularly described the tracts of plaintiffs’ property used in the repair work as ''borrow” or "access” sites, explained the federally approved method of determining compensation based on the value of the land at the time of the taking, the location, and the highest and best use of the land. Based on their appraisals, the USACE offered specific amounts of just compensation to the plaintiffs.

. The Vuljan Court relied on the Louisiana Supreme Court’s holding and reasoning in Cooper v. City of Bogalusa, 195 La. 1097, 198 So. 510 (1940), in which the facts and circumstances were "substantially identical” to Vuljan. In Cooper, plaintiffs filed an action against the City of Bogalusa for damages allegedly resulting from the dredging of the Pearl River by the United States government. The City of Bogalusa had adopted a series of resolutions, in compliance with the federal government's requirements for local cooperation, in which the City assumed "full respon- . sibility for all damages to property incident to the construction of the canal, including any and all claims that may result from the isolation of property ... and to hold and save harmless the United States.” Cooper, 198 So. at 511. The Louisiana Supreme Court found that the United States was in exclusive control of the project and exercising its own power and authority.
*979 If plaintiff has suffered damage, then the active and only agency causing damage is the United States government. The work is solely under the direction and control of the United States government ... The City of Bogalusa stands only in the position of being wiling to pay whatever expenses or assessment the United States might incur in connection with the acquisition of the necessary right of way and such property damage as the owner might recover against the United States.
Id. 198 So. at 512.

. 181 So.2d 811 (La.App. 4th Cir.1966). Oyster leaseholder hied suit for damages against the State for damage allegedly caused by the construction of the Barataría Bay Waterway. Relying on Vuljan, the Court found that the pertinent question when considering the taking and damaging of private property is who did the taking. The acquisition and furnishing of necessary rights of way for the project and an agreement to hold harmless the United States does not give rise to a cause of action against the State for a federal project. Id., at 814.

. The trial court quoted a sentence from the U.S. District Court's Order and Reasons: "[t]he federal government, in concert with state authorities, obtained rights over the land upon which the Levee was built.” Olivier, 744 F.Supp.2d at 577-78. The District Court made this statement in the factual "Background” of its order and reasons in specific reference to the appropriating resolutions adopted for the original construction of the LPLV hurricane protection levee. The District Court outlined the factual and procedural background of the case before discussing the law and arguments regarding the court’s jurisdiction over the claims in the petition and third party demand.

. The USACE, at first, argued that removal to federal court was proper since it is a federal agency named in the third party demand but sought transfer of the entire case to the Court of Federal Claims, which has exclusive jurisdiction over Fifth Amendment takings claims. The Parish and the Levee District also sought transfer of the action to the Court of Federal Claims. In the alternative, they argued for the U.S. District Court to retain jurisdiction *981 on the basis of the federal officer or agent removal statute, 28 U.S.C. § 1442(a) or under the Federal Tort Claims Act.

.The Federal Tort Claims act, 28 U.S.C. § 1346(b)(1) provides in pertinent part,
[Djistrict courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ..., for injury or loss of property, ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
"The mere fact that a complaint sounds in tort does not transform a contract or a taking claim into a tort action cognizable under § 1346(b). The substance of the claim and not the characterization controls ...” Karlen v. U.S., 727 F.Supp. 544, 546 (D.S.D.1989).

. The federal officer removal statutes, 28 U.S.C. § 1442, provides that the United States, or an agency or officer thereof can remove a state court action, that is directed against that government agency or officer, to federal district court.

. The United States Court of Federal Claims holds jurisdiction, pursuant to the Tucker Act, 28 U.S.C. § 1491, "for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract.” Preseault v. I.C.C., 494 U.S. 1, 12, 110 S.Ct. 914, 922, 108 L.Ed.2d 1.

. Both Louisiana and federal jurisprudence use the same analysis based on the specific facts of the case in consideration of the statutory and regulatory framework involved, and the respective actions taken by the federal government and the state or local government. See Anderson v. Red River Waterway Com’n, 231 F.3d 211 (5th Cir.2000); Pendleton v. U.S., 47 Fed.Cl. 480 (2000); B & G Enterprises, Ltd. v. U.S., 43 Fed.Cl. 523 (1999).